# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, HAGLER, and EWING[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Staff Sergeant JASON A. LOPEZ**
**United States Army, Appellant**

ARMY 20170386

Headquarters, United States Army Maneuver Center of Excellence
Richard J. Henry, Military Judge
Colonel Wendy P. Daknis, Staff Judge Advocate

For Appellant: Captain Augustus Turner, JA (argued);[2] Lieutenant Colonel Tiffany D. Pond, JA; Major Todd W. Simpson, JA; Captain Augustus Turner, JA (on brief and reply brief); Captain Heather M. Martin, JA.

For Appellee: Captain Brian Jones, JA (argued); Colonel Steven P. Haight, JA; Lieutenant Colonel Eric K. Stafford, JA; Captain Brian Jones, JA (on brief); Captain Jeremy S. Watford, JA.

25 March 2019

---------------------------------
OPINION OF THE COURT
---------------------------------

EWING, Judge:

The central issue in this appeal is the lawfulness of the search which uncovered live hand grenades, stolen government property, and multiple firearms, including an illegal assault rifle, in appellant's home. While our reasoning differs from that of the military judge, we hold that the evidence seized from appellant's quarters was properly admitted at appellant's court-martial. Separately, we agree

---

[1] Judge Ewing decided this case while on active duty.

[2] The court heard oral argument on 13 February 2019 at George Washington University Law School as part of the court's outreach program.

with appellant that the government's evidence was legally insufficient to sustain appellant's five convictions for failing to obey a local Fort Benning regulation, and provide relief in our decretal paragraph.[3]

## BACKGROUND[4]

### *The Request for a Search Authorization*

Appellant was an instructor assigned to the 5th Ranger Training Battalion ("RTB"), with duty at the mountain phase of the U.S. Army Ranger School at Camp Merrill, Georgia. Camp Merrill is in north Georgia, approximately three hours by car from Fort Benning. While stationed at Camp Merrill, appellant lived in "Porter Village," a privatized military housing community approximately twelve miles from Camp Merrill in neighboring Dahlonega, Georgia.

---

[3] An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of failure to go to his appointed place of duty, five specifications of failure to obey a lawful general regulation, two specifications of failure to obey a lawful order, three specifications of larceny of government property of a value over $500.00, one specification of wrongful appropriation of government property, three specifications of assault consummated by battery, and two specifications of violating the National Firearms Act (28 U.S.C. § 5861), in violation of Articles 86, 92, 121, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 921, 928, and 934 (2012) (UCMJ). The panel sentenced appellant to confinement for two years. The convening authority approved the adjudged sentence, deferred service of the sentence to confinement until appellant was permanently released to the armed forces by state authorities, and credited appellant with 202 days of confinement credit.

[4] On appeal, appellant asserts five assignments of error. Two of the asserted errors challenge the military judge's suppression ruling, and we address these contentions at length in this opinion. A third assignment of error asserts that the evidence was legally and factually insufficient to sustain appellant's convictions for failure to obey a lawful order. Because we agree with appellant on this issue, his two remaining assignments of error (vagueness and instructional challenges to the same specifications) are rendered moot.

We have also considered appellant's matters submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find that they either do not warrant discussion or relief, or they are otherwise part and parcel to our discussion of the suppression motion.

At a St. Patrick's Day celebration in Savannah, Georgia, on Saturday, 19 March 2016, local authorities arrested appellant for assaulting his wife and carrying a concealed firearm without a permit. In the immediate wake of appellant's arrest, a fellow Ranger Instructor at Camp Merrill, Sergeant First Class (SFC) MM,[5] came forward to his chain of command, and reported seeing appellant in possession of what appeared to be two live M67 hand grenades and a military-style M4 assault rifle during a party at appellant's residence in December of 2015. Sergeant First Class MM also reported that appellant had a large gun safe at his residence. The 5th RTB Executive Officer, Major (MAJ) CG, and the 5th RTB Command Sergeant Major (CSM) JD, had both also seen the large gun safe in appellant's quarters.

The 5th RTB chain of command responded to appellant's arrest and SFC MM's disclosures through much of the day on Monday, 21 March 2016. Appellant's company commander learned from the Fort Benning Provost Marshal's Office that appellant did not have any personal firearms registered with that office. The command believed that a local Fort Benning regulation, Maneuver Center of Excellence (MCOE) Regulation 190-11, required appellant to register any privately-owned weapons stored at his Porter Village residence.

The command consulted the Fort Benning Office of the Staff Judge Advocate (OSJA), and specifically Senior Trial Counsel, Captain (CPT) MM, regarding the possibility of searching appellant's quarters. Captain MM indicated that "[b]ased on the information provided by [MAJ CG], evaluated by myself and [CPT EI -- the Fort Benning Garrison trial counsel], we believe there is probable cause to believe that the subject possesses unregistered weapons in his residence. Further, we believe that the [Fort Benning] garrison has jurisdiction over Porter Village."[6]

In coordination with the chain of command, CPT EI requested that the Fort Benning Garrison Commander, Colonel (COL) AH, authorize a search of appellant's Porter Village quarters. Along with this request, Captain EI forwarded COL AH an email from MAJ CG which stated the following:

---

[5] Sergeant First Class MM initially requested confidentiality from the chain of command because of his fear that appellant would retaliate against him and his family. While the Garrison Commander did not name SFC MM in his search authorization, SFC MM's identity was known to the chain of command, and he testified at the suppression motion at appellant's court-martial.

[6] Much of the coordination between the 5th RTB and the Fort Benning OSJA was done via emails which are included in the record of trial. 5th RTB's higher headquarters was located on Fort Benning.

[T]he concealed weapon that [appellant] had when arrested this weekend was not registered on [Fort Benning]. We know that he has other weapons and received confirmation that he doesn't have ANY weapons registered on [Fort Benning]. The company chain of command received an anonymous[7] tip from another soldier that [appellant] displayed M67 Fragmentary grenades and also an M4 with the W identifier in the serial number (that is common to government issued weapons) at his residence 2-3 months ago.

Separately, the Fort Benning Staff Judge Advocate, COL WD, indicated via email that COL AH had jurisdiction over appellant's residence in Porter Village and could therefore authorize the search. Colonel AH, who was away from Fort Benning at the time, responded that he had "[m]onitored" the email traffic and was prepared to sign the search authorization.

*The Search Authorization*

On 21 March 2016, COL AH signed a "Search Authorization Based Upon Probable Cause," which authorized the military police to search appellant's quarters. The search authorization read, in pertinent part, as follows:

On 19 March 2016, [appellant] was arrested in Savannah, Georgia by civilian authorities for striking his wife and for carrying a concealed carry weapon while intoxicated. Fort Benning Military Police conducted a database search and discovered that [appellant] had no weapons registered with Fort Benning authorities. [Appellant's] chain of command received a tip from a Soldier who had been in [appellant's] residence within the last 2-3 months, who stated that [appellant] had other unregistered firearms, and possibly explosives, in the house. Due to the relationship the Soldier has with [appellant] and the Soldier's concern for the safety of his family, the chain of command finds his information very reliable. The chain of command believes [appellant] poses a danger not only to his wife, but also to his neighbors and the other Soldiers at Camp Merrill.

---

[7] Despite repeated references to anonymity within the record, the tip from SFC MM was confidential, not anonymous – his identity was secret, not unknown.

4

Ultimately, COL AH authorized the military police to search for "firearms, explosives, and other armaments, to include any gun safe that may be located on the premises or outlying curtilage."

*The Fruits of the Search*

Military law enforcement personnel, in coordination with the 5th RTB chain of command, executed the search of appellant's Porter Village quarters on 22 March 2016. At various locations in appellant's quarters, law enforcement personnel found: an AN/PEQ 15 illuminator; an AN/PEQ 2 infrared illuminator; three M67 fragmentation hand grenades; seventeen M115A2 projectile simulators; an M18 smoke grenade; a claymore mine detonator; an M69 practice grenade; an M127 slap flare; a Smith and Wesson Model M&P-15 semi-automatic rifle; a single bolt-action rifle; a 12-gauge shotgun; a Ruger .22 caliber rifle; and a Remington Model 700 .22 caliber rifle.[8]

*The Suppression Motion and Military Judge's Ruling*

At trial, appellant moved to suppress the fruits of the search of his residence. Appellant contended in his written motion: (1) that the search authorization lacked probable cause, because of the staleness of SFC MM's information and the lack of further information about SFC MM's veracity; and (2) that the Fort Benning Garrison Commander did not have authority to authorize a search of appellant's residence in Porter Village. At a pretrial motions hearing, appellant further contended that the search authorization lacked probable cause because MCOE 190-11 did not apply to Porter Village, and, as such, appellant had no duty to register his privately-owned weapons.

Following a written response by the government and a suppression hearing, the military judge denied appellant's suppression motion in a five-page written ruling. The military judge held that the Fort Benning Garrison Commander was the appropriate authority to issue the search authorization, and that the "search of the Accused's home was . . . based on valid, non-stale information that formed probable cause to believe weapons and explosives would be found in the Accused's home." In his ruling, the military judge did not explicitly address whether MCOE 190-11 applied to Porter Village; during trial, however, the military judge denied a defense motion under Rule for Courts-Martial (R.C.M. 917) regarding the same issue.

---

[8] This evidence ultimately gave rise to appellant's convictions for violating Articles 92, 121, and 134, UCMJ.

*Issues Raised on Appeal*

On appeal, appellant challenges the introduction of the fruits of the search of his residence on the grounds that COL AH did not have the requisite authority over Porter Village to authorize the search of appellant's quarters. Appellant further contends that the search authorization lacked probable cause because MCOE 190-11 did not require appellant to register his privately-owned firearms on Porter Village, and the search authorization was not otherwise supported by probable cause.

As outlined below, we find that: (1) the Fort Benning Garrison Commander had authority to issue the search of appellant's quarters; and (2) MCOE 190-11 did not require appellant to register his firearms on Porter Village. Ultimately, we hold that, assuming *arguendo* that the search authorization otherwise lacked probable cause, the good-faith exception to the exclusionary rule authorized the admission of the fruits of the search of appellant's residence.

## LAW AND DISCUSSION

*A. Whether the Military Judge Erred in Denying Appellant's Motion to Suppress*

*1. Standard of Review and Legal Principles*

We review a military judge's denial of a motion to suppress for an abuse of discretion. *United States v. Smith*, 77 M.J. 631, 635 (Army Ct. Crim. App. 2018) (citing *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016)). We reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if the judge's decision is influenced by an erroneous view of the law. *United States v. Owens*, 51 M.J. 204, 209 (C.A.A.F. 1999) (citation omitted). We consider the evidence in the light most favorable to the prevailing party, in this case the government. *United States v. Macomber*, 67 M.J. 214, 219 (C.A.A.F. 2009) (citation omitted). Where a military judge reaches the correct result in ruling on a suppression motion, but for the wrong reason, the judge's ruling "must be affirmed." *United States v. Carista*, 76 M.J. 511, 515 (Army Ct. Crim. App. 2017) (internal quotation marks and citations omitted).

Pursuant to the Military Rules of Evidence (Mil. R. Evid.), commanders are empowered to authorize searches of servicemembers' quarters. Specifically, an impartial commander "who has control over the place where the property . . . to be searched is situated" is authorized to issue a search authorization, Mil. R. Evid. 315(d)(1), "based upon probable cause." Mil. R. Evid. 315(f)(1).

Probable cause to search exists when, based on written and oral statements and "information as may be known by the authorizing official that would not preclude the officer from acting in an impartial fashion," Mil. R. Evid. 315(f)(2)(C),

6

there "is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Mil. R. Evid. 315(f)(2).

A valid search authorization requires the impartial authorizing official to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also, e.g.*, *United States v. Cowgill*, 68 M.J. 388, 393 (C.A.A.F. 2010) (following *Gates*); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause to search "exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found" in a particular place).

In reviewing probable cause determinations, "courts must look at the information made known to the authorizing official at the time of his decision." *United States v. Carter*, 54 M.J. 414, 418 (C.A.A.F. 2001) (citation omitted). We do not review such determinations de novo, but rather "our duty is to make sure that the authorizing official had a 'substantial basis' for concluding that probable cause existed." *Hoffmann*, 75 M.J. at 125 (quoting *United States v. Huntzinger*, 69 M.J. 1, 7 (C.A.A.F. 2010) (quoting, in turn, *Gates*, 462 U.S. at 238-39)).

"Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the 'fruit of the poisonous tree' and is generally not admissible at trial." *United States v. Conklin*, 63 M.J. 333, 334 (C.A.A.F. 2006) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). However, where the "good faith exception" to the general rule of exclusion applies, the fruits of an unlawful search are nonetheless admissible at trial. The good faith exception to the exclusionary rule is applicable in instances where investigators "act with an objectively reasonable good faith belief that their conduct is lawful." *Smith*, 77 M.J. at 636 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)) (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)) (internal quotation marks omitted).

The test is "whether a reasonably well-trained officer would have known that the search was illegal" in light of "all of the circumstances." *Id*. (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)) (citing *Leon*, 468 U.S. at 922, n.23). This standard takes into account the officer's training and experience, but not his or her subjective intent. *Herring*, 555 U.S. at 145-46. The good faith exception recognizes that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity," *Leon*, 468 U.S. at 918-19, but rather "is designed to deter police misconduct rather than to punish the errors of judges and magistrates" who "have no stake in the outcome of particular criminal prosecutions," so "[t]he threat of exclusion thus cannot be expected significantly to deter them." *Id*. at 916-17.

Mil. R. Evid. 311(a)(3) likewise provides, in pertinent part, that evidence "obtained as a result of an unlawful search or seizure . . . is inadmissible against the accused if . . . exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."

In addition to Mil. R. Evid. 311(a)(3), Mil. R. Evid. 311(c)(3) "embodies the good faith exception as articulated in *Leon* and *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), which specifically address the scenario when law enforcement officers rely on a subsequently invalidated search warrant." *Smith*, 77 M.J. at 636.

*2. Search Authority*

The threshold question in evaluating the search of appellant's Porter Village quarters is whether the Fort Benning Garrison Commander exercised sufficient "control" over those quarters so as to have the authority, pursuant to Mil. R. Evid. 315, to authorize the search.

We hold that he did.

Military Rule of Evidence 315(d)(1) explains, in pertinent part, that military commanders are empowered to authorize searches in areas where the commander "has *control over the place* where the property or person to be searched is situated or found." (emphasis added). Before this Court, appellant has characterized Porter Village as "owned and operated" by a private entity – namely, "Villages of Benning," which also operates privatized housing on Fort Benning itself – and thus has analogized appellant's quarters on Porter Village to a private, off-post residence with no connection to appellant's military service.

The government presented different facts during the suppression hearing before the military judge. The government introduced a deed of sale, indicating that the United States had purchased Porter Village for $300,000 in 1993, and owned the land in fee simple. Accompanying the deed were U.S. Army Corps of Engineers documents, which labeled the map of "Porter Village" as "Family Housing for Camp Frank D. Merrill."

The government also provided the military judge with a "Memorandum of Agreement ('MOA') between the United States of America and The State of Georgia," in which the United States and Georgia agreed to concurrent federal-state law enforcement jurisdiction over Porter Village. The MOA, finalized in 2009, recognized that "Porter Village was purchased by the United States for military family housing for officer and enlisted quarters for soldiers assigned to Camp Frank D. Merrill," and gave the United States jurisdiction to enforce federal "laws, rules, and regulations . . . for the preservation and protection of its property and the

maintenance of good order, including the provision of law enforcement services and security."[9]

Moreover, the Fort Benning Garrison Commander's command relationship with Porter Village was clear and direct. The U.S. Army Ranger School was based on Fort Benning, and Camp Merrill was a sub-post of Ranger School. The Army bought and owned the land for Porter Village for family housing for soldiers assigned to Camp Merrill.

Together, this command relationship, along with the deed of sale and MOA with Georgia, established that the United States, and particularly the Army and the Fort Benning Garrison Commander, had ample "control" over Porter Village, as described by Mil. R. Evid. 315(d), and could therefore authorize a search of appellant's quarters.

Appellant's contrary arguments are unavailing. First, appellant's main authority for the proposition that the Fort Benning Garrison Commander lacked authority over Porter Village – *United States v. Chapple*, 36 M.J. 410 (C.M.A. 1993) – is readily distinguishable. In *Chapple*, a Navy commander authorized a search of the defendant's off-base apartment in Italy, where the defendant's fiancée (another servicemember) paid rent to an Italian landlord. *Id.* at 411. The only connection between the command and the apartment was the command's responsibility to "operate a housing referral office." *Id.* at 413. The (then) Court of Military Appeals (C.M.A.) held that the running of such a referral office did not "confer any authority over the property leased" through the referral office. *Id.* Notably, unlike here, the United States did not own the land upon which the apartment sat, nor was there any special designation of "family housing" for the area, or anything analogous to the U.S.-Georgia MOA between the United States and Italy. Chapple was simply living in a private apartment in Italy, which is not analogous to living on Porter Village.[10]

Second, the "privatized" nature of Porter Village did not vitiate the United States', and in particular the U.S. Army's, control over the housing complex for purposes of Mil. R. Evid. 315(d). *See* Army Reg. 27-10, Legal Services: Military Justice [AR 27-10], para. 8-13 (11 May 2016) ("The 'privatization' of on-post

---

[9] The finalized MOA was signed by the Governor of Georgia, the Deputy Assistant Secretary of the Army for Installations and Housing, and a two-star general.

[10] Notably, one C.M.A. judge would have found the requisite "control" even in the *Chapple* scenario, 36 M.J. at 414 (Sullivan, C.J., concurring in the result), and the majority in *Chapple* upheld the admission of the fruits of the off-base search pursuant to the good-faith exception. *Id.* at 413-14.

housing and other facilities in no way diminishes the authority of military judges and military magistrates, garrison commanders or installation commanders to authorize searches of on-post housing or facilities whether 'privatized' or not.")[11]; *Cf. United States v. Moreno*, 23 M.J. 622, 624 (A.F.C.M.R. 1986) ("The air base group commander had law enforcement responsibilities over the on-base credit union.").

Third, in light of the MOA with Georgia, and the United States' ownership interest in Porter Village, the location of Porter Village does not aid appellant. While it is true that Porter Village was not physically on Camp Merrill or Fort Benning, other cases have made clear that military commanders can possess sufficient authority over off-base housing areas to order searches and take other actions. *See, e.g.*, *United States v. Reppert*, 76 F. Supp. 2d 185, 188 (D. Conn. 1999) (upholding probable cause search authorized by Navy commander for active duty servicemember's off-base apartment, where Navy had rented the apartment for the benefit of the servicemember); *Donnelly v. United States*, 525 F. Supp. 1230 (E.D. Va. 1981) (upholding admission of fruits of health and welfare inspection of off-base apartment leased by the Navy on defendant's behalf); *Adamski v. Martis*, 2007 U.S. Dist. LEXIS 53160 (N.D. Cal. July 9, 2007) (unpublished) (upholding Garrison Commander's authority to bar registered sex offender from "The Parks at Monterey Bay," a privatized housing complex on what was formerly Fort Ord, California). *See also* Major Jeff A. Bovarnick, *Can a Commander Authorize Searches & Seizures in Privatized Housing Areas?*, 181 Mil. L. Rev. 1, 32 (2004) ("Where the privatized housing community is located, on or off the installation, has no impact on military law enforcement officials over service members (assuming a valid apprehension or search authorization)") (internal parenthesis in original).

Where, as here, the United States had an ownership interest in the land, and concurrent jurisdiction to conduct law enforcement activities with the State of Georgia, the Garrison Commander exercised ample control over Porter Village to authorize the search of appellant's quarters.

### 3. Probable Cause

Having found that the Fort Benning Garrison Commander had proper authority to authorize this search, we next turn to the issue of whether that search authorization was supported by probable cause. We hold that the evidence that appellant had unregistered firearms in his residence did not give rise to probable cause to search appellant's residence, because appellant had no duty to register

---

[11] The regulation in effect during the search of appellant's residence included the same language.

under the applicable local regulation. We also determine that we ultimately do not need to resolve the close question of whether the search authorization was otherwise supported by residual probable cause.

*a. Applicability of MCOE 190-11 to Porter Village*

In both seeking and authorizing the search of appellant's quarters, appellant's command and the Fort Benning Garrison Commander believed that appellant had a duty to register the personally-owned firearms he kept at his home in Porter Village. Thus, the question of whether MCOE 190-11 does, in fact, require such registration bears directly on the question of whether the Fort Benning Garrison Commander's search authorization was supported by probable cause.

Construction of regulations is a question of law, which we review de novo. *United States v. Estrada*, 69 M.J. 45, 47 (C.A.A.F. 2010) (citations omitted). In interpreting regulations, we apply the general rules of statutory construction. *Id.* (citations omitted).

The words "Porter Village" appear nowhere in MCOE 190-11. Moreover, when we apply the general rules of statutory construction to MCOE 190-11, we conclude that the regulation cannot fairly be read to cover Porter Village. Paragraph 2-2 of MCOE 190-11 requires servicemembers residing on Fort Benning to register their privately-owned weapons with the Military Police. However, the regulation further explains that "[f]or the purpose of this regulation, the words 'Fort Benning' shall include the installation of Fort Benning, Camp Merrill, and the Morale, Welfare, and Recreation Destin Army Recreation Area." The regulation also states that it is "equally applicable to occupants of Battle Park Homes," the privatized housing located within the confines of Fort Benning.

Thus, MCOE 190-11 makes clear that certain areas outside of Fort Benning proper are covered by the regulation, and then lists such areas. Moreover, the regulation lists the privatized housing of "Battle Park Homes" as a covered area. By defining "Fort Benning" to include a list of covered areas, and by expressly listing another privatized housing area, the regulation by implication *excludes* other similar areas, such as Porter Village. *See, e.g., United States v. Hodge*, 902 F.3d 420, 428 (4th Cir. 2018) (explaining that "*expressio unius exclusio alterius*" [the expression of one thing is the exclusion of another] doctrine of statutory interpretation applies with greatest force "when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence") (internal quotation marks and citation omitted); *United States v. Mooney*, 77 M.J. 252, 257 (C.A.A.F. 2018) (applying the same canon of construction).

11

Nor can it be said that the inclusion of "Camp Merrill" in the regulation's list of covered places incorporated Porter Village. The government's own documentary evidence at the suppression motion indicated that Porter Village was miles away from Camp Merrill, and was the "housing area" for those servicemembers assigned to Camp Merrill, as opposed to part of the camp itself.

It is true that MCOE 190-11 does not say that "Fort Benning shall *only* include" the listed areas, thus leaving open the theoretical possibility of coverage of additional areas. However, if the regulation actually applied to *any area* controlled by the Fort Benning Garrison Commander, the regulation could have easily said that, rather than providing a specific list of covered areas. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (describing "cardinal principle" of statutory interpretation that courts "must give effect, if possible, to every clause and word of a statute"). Thus, as explained *supra*, while the Fort Benning Garrison Commander exercised control over Porter Village, and *could* have required servicemembers living there to register their weapons pursuant to MCOE 190-11, he did not include Porter Village in the regulation. It is not for this Court to read into the regulation words that are not there.

Finally, there is a "fair notice" issue with reading the words "Porter Village" into MCOE 190-11. *See, e.g.*, *United States v. Caporale*, 73 M.J. 501, 504 (A.F. Ct. Crim. App. 2013) ("Due process requires 'fair notice' that an act is forbidden and subject to criminal sanction."). As having a firearm in one's home is not inherently criminal, *see District of Columbia v. Heller*, 554 U.S. 570 (2008), the "fair notice" of criminality here would have to come from MCOE 190-11. Because the regulation does not mention Porter Village, it does not provide the requisite notice of criminality. *Cf. United States v. Pope*, 63 M.J. 68, 73 (C.A.A.F. 2006) (to withstand vagueness challenge, "a regulation must provide sufficient notice so that a servicemember can reasonably understand that his conduct is proscribed").

Because we hold that MCOE 190-11 did not impose a registration requirement on appellant, the evidence that appellant had otherwise lawfully-owned firearms in his residence did not provide probable cause to search his home.

### b. Residual Probable Cause

Having set aside the evidence that appellant had "unregistered" firearms in his residence, the question remains as to whether the commander nonetheless had a "substantial basis," *Hoffmann*, 75 M.J. at 125, for concluding that probable cause existed based on the additional information regarding explosive devices. *See, e.g.*, *Cowgill*, 68 M.J. at 393 (following a finding of certain improper information in a warrant affidavit, our superior court (CAAF) "sever[ed] that [improper] information from the affidavit and determine[d] whether sufficient information remained in order for the magistrate to find probable cause.").

Here, the government's evidence that appellant had live hand grenades in his residence is germane.[12] The government's grenade evidence, however, was inconclusive.

Unlike firearms, live hand grenades are of a more inherently contraband nature, both because they are likely stolen government property (particularly in the context of an active-duty servicemember's home), and because the Second Amendment does not cover the private possession of hand grenades. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 609 (1994) ("one would hardly be surprised to learn that possession of hand grenades is not an innocent act") (internal quotation marks and citation omitted); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (Second Amendment does not provide private right to possess hand grenades).

On the other hand, the government's information that appellant possessed the grenades was through SFC MM, and was two-to-three months old, and therefore somewhat stale. *See, e.g.*, *United States v. Lopez*, 35 M.J. 35, 38-39 (C.M.A. 1992) ("the timeliness of the information and the relationship between the crime objects and place to be searched are aspects of the probability test"). Further, while not dispositive, the Fort Benning Garrison Commander characterized the government's evidence as showing that appellant "possibly" had "explosives" (e.g. grenades) in his residence. Our sister court has said that the "possible" existence of evidence does not make out probable cause. *See United States v. Perkins*, 78 M.J. 550, 557 (N.M. Ct. Crim. App. 2018) (certificate of review filed) __ M.J. __, (C.A.A.F. 10 Sep. 2018) ("probable cause requires more than an assessment that something is possible").

Ultimately, as explained below, this case does not turn on whether the government had residual probable cause after setting aside the MCOE 190-11 evidence. Even assuming *arguendo* that COL AH lacked probable cause to order the search of appellant's residence, the fruits of that search were nonetheless admissible under the good faith exception to the exclusionary rule.

### *4. The Exclusionary Rule and Military Rule of Evidence 311(a)(3)*

The purpose behind the exclusionary rule is only served where "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(3). The Supreme Court and the CAAF have said likewise. *See, e.g.*,

---

[12] Sergeant First Class MM also provided the information about an M4 assault rifle that appeared to him to be a government-issued firearm, which, like grenades, would be unlawful notwithstanding the applicability of MCOE 190-11.

*United States v. Wicks*, 73 M.J. 93, 104 (C.A.A.F. 2014) (fruits of an unlawful search are inadmissible where exclusion "'result[s] in appreciable deterrence' for future Fourth Amendment violations and where the 'benefits of deterrence . . . outweigh the costs'") (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)). *See also United States v. Eppes*, 77 M.J. 339, 349 (C.A.A.F. 2018) (exclusionary rule is "drastic and socially costly" and should only be applied where "needed to deter police from violations of constitutional and statutory protections") (quoting *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)).

Simply put, even assuming *arguendo* that the search authorization here lacked probable cause, exclusion on these facts offers little to no deterrence value. Upon learning of appellant's arrest in Savannah, and the additional information about the guns and explosives in appellant's quarters, the command prudently sought the advice of their servicing judge advocates, and sought and obtained a search authorization from the responsible commander. In other words, appellant's command took steps that were appropriate under the circumstances.

Likewise, the law enforcement personnel who carried out the search reasonably relied on the search authorization. That the search authorization may have ultimately lacked probable cause does not impute any improper action to either the chain of command, who sought and obtained the search authorization, or to the law enforcement personnel who ultimately executed the search. *See, e.g.*, *Leon*, 468 U.S. at 916 ("the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates"); *Messerschmidt v. Millender*, 565 U.S. 535, 547, 549 (2012) (Officers executing warrants are not often expected to question the conclusions of an issuing authority, and so to preclude application of the good faith exception, an officer's reliance on an issuing authority's probable cause determination must have been "entirely unreasonable").

As any miniscule deterrent value here does not "outweigh the costs to the justice system," Mil. R. Evid. 311(a)(3), exclusion of the evidence is unwarranted, but we further address Mil. R. Evid. 311(c) in the next section. As shown below, we reach the same conclusion.

### 5. *The Good-Faith Exception and Mil. R. Evid. 311(c)*

An analysis under Mil R. Evid. 311(c) likewise demonstrates the appropriateness of the good-faith exception here. Specifically, the government has shown by a preponderance of the evidence that: (a) the search resulted from an authorization to search issued by an individual competent to issue the authorization (e.g., the Garrison Commander); (b) there was a "substantial basis" for determining the existence of probable cause, both by the command who sought the search authorization and the law enforcement personnel who carried it out; and (c) the officials seeking and executing the search authorization reasonably and with

objective good faith relied on the issuance of the authorization. Mil. R. Evid. 311(c)(3).[13]

Two separate lines of logic independently, and collectively, show that it was objectively reasonable for the law enforcement officials who executed the search to rely on the search authorization. First, while we have determined here that MCOE 190-11 did not require appellant to register his privately-owned firearms, the command's mistaken belief that the regulation *did* require such registration was a "reasonable mistake of law," as described by the Supreme Court in *Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). In *Heien*, the Supreme Court held that a police officer's reasonable, but mistaken, understanding that North Carolina law required drivers to have two working brake lights (the applicable statute actually required only one) could provide the reasonable, articulable suspicion necessary to conduct a traffic stop. *Id*. at 535-37. The Supreme Court further explained that the officer's "mistake of law relate[d] to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal." *Id*. at 539.

Likewise here, the applicability of MCOE 190-11 related, not directly to the question of probable cause, but rather to the "antecedent question" of whether appellant's conduct in keeping firearms at his residence violated the law. While the mistake of law in *Heien* went to the reasonableness of a traffic stop itself (thus the Supreme Court's finding that there was no Fourth Amendment violation *at all*, *Heien*, 135 S. Ct. at 536), here the command's mistaken belief that MCOE 190-11 applied to Porter Village contributed to the reasonableness of their reliance on the search authorization. *See also, e.g.*, *United States v. Fields*, 74 M.J. 619, 623 & n.3 (A.F. Ct. Crim. App. 2015) ("[r]easonable mistakes of law are permitted to support probable cause determinations under the Fourth Amendment"); *cf. United States v. Seerden*, No. 18-4124, 2019 U.S. App. LEXIS 4891 (4th Cir. Feb. 20, 2019) (search of servicemember's phone authorized by wrong commander, but good faith exception nonetheless applied); *Chapple*, 36 M.J. at 413-14 (applying good faith

---

[13] We note that the issue of how to interpret the "substantial basis" language in Mil. R. Evid. 311(c)(3) is pending decision before the CAAF in *United States v. Perkins*, 78 M.J. 550 (N.M. Ct. Crim. App. 2018) (certificate of review filed) __ M.J. __, (C.A.A.F. 10 Sep. 2018). However because our Court followed *Carter* as recently as *Smith*, 77 M.J. at 637 ("in finding the government met prong (B) of Mil. R. Evid. 311(c)(3), we look to *Carter*"), we likewise do so here. We find that there was a substantial basis for an objectively reasonable law enforcement official executing this search to rely on the authorization.

exception where commander who authorized search had no legal authority to do so).[14]

The trial record includes evidence of the reasonableness of this mistake of law. Multiple Judge Advocates, including the Garrison Commander's trial counsel, and the military judge at appellant's court-martial, believed that MCOE 190-11 required appellant to register his privately-owned weapons in Porter Village. *Cf. Armstrong v. City of Melvindale*, 432 F.3d 695, 702 (6th Cir. 2006) (evaluating an officer's reliance on a prosecutor as a factor in determining the reasonableness of the officer's probable cause determination). Moreover, while the regulation did not include Porter Village, it *could* have, based on the nature of Porter Village itself (described *supra*) and the command relationship between Porter Village, Camp Merrill, and the Fort Benning Garrison Commander. Thus, following the logic of *Heien*, if it was reasonable (even if incorrect), to believe that appellant had a duty to register his firearms in Porter Village, then it was also reasonable to rely on the Garrison Commander's search authorization for those same unregistered weapons.

Second, even wholly setting aside the MCOE 190-11 evidence, the command and law enforcement personnel still had an objectively reasonable basis to rely on the Garrison Commander's search authorization, which also sought "explosives and other armaments" in addition to firearms. Unlike firearms, "explosives" are inherently contraband, and the search authorization details an eyewitness account of appellant's possession of explosives in his home. Thus, again, even discounting the firearms evidence, the search authorization was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Carter*, 54 M.J. at 419 (quoting *Leon*, 468 U.S. at 923).[15]

---

[14] *Heien* involved a reasonable mistake of law by a police officer in a traffic stop situation. While we are unaware of any case which relies on *Heien* in the search warrant/authorization context, *Heien's* logic applies here. Like the North Carolina statute at issue in *Heien*, the command's interpretation of MCOE 190-11 was an "antecedent question" of law. *Heien*, 130 S. Ct. at 539.

[15] Appellant correctly points out that certain law enforcement personnel involved in the search of appellant's quarters expressed some doubts about the legality of the search. Specifically, the PMO personnel on the scene had been informed by their supervisor that they would conduct only a "safety sweep" of appellant's residence, and not a search based on probable cause, presumably because the supervisor had doubts about the legality of the search authorization. Appellant's claim that this negates the good faith exception to the exclusionary rule fails. First, the test is whether an *objectively* reasonable law enforcement official could rely on the search authorization, and does not look to the subjective intent of the officers. *See, e.g.,*

(continued . . .)

As such, even if the Garrison Commander's search authorization lacked probable cause, the fruits of the search of appellant's residence were properly admissible under the good faith exception to the exclusionary rule.

*B. Legal Sufficiency of Failure to Register Convictions*

Appellant has separately claimed that his convictions for failing to register his privately-owned weapons on Porter Village were not supported by legally and factually sufficient evidence. We review claims of legal and factual insufficiency de novo, examining all of the evidence properly admitted at trial. UCMJ art. 66; *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for legal sufficiency is whether, considering the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the contested crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

In light of our holding that MCOE 190-11 did not require appellant to register his privately-owned weapons on Porter Village, we *ipso facto* find that the government's evidence was legally insufficient to sustain appellant's five convictions (Specifications 1-5 of Charge IV) for failing to obey that same lawful general regulation.

**CONCLUSION**

Appellant's convictions for Specifications 1-5 of Charge IV are SET ASIDE and DISMISSED. The remaining findings of Guilty are AFFIRMED.

Reassessing the sentence on the basis of the errors noted, the entire record, and in accordance with the principles of *United States v. Sales*, 22 M.J. 305, 307-08 (C.M.A. 1986) and *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013), we affirm only so much of the sentence as provides for confinement for twenty-three months. All rights, privileges, and property of which appellant has been deprived by virtue of that portion of his sentence set aside by this decision are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Judge HAGLER concurs.

---

(. . .continued)
*Smith*, 77 M.J. at 636. Second, to the extent that subjective reliance is at all in play, CID personnel testified at appellant's suppression hearing that they searched appellant's house in subjective reliance on the search authorization.

WOLFE, Senior Judge, concurring:

I am not sure it is quite so clear that MCOE 190-11 did not require appellant to register the firearms he kept at his residence at Porter Village. The operative language relied on by appellant is contained in a prefatory "summary" paragraph; not the body of the regulation. But, I need not answer this question definitively as I otherwise concur with today's opinion in full.

I agree that even if MCOE 190-11 technically required the registration of appellant's firearms,[16] it did not provide appellant with sufficient notice to hold him criminally liable (for the exact reasons stated by Judge Ewing). I also agree that the Garrison Commander had the clear authority to authorize a search of Porter Village. And I concur with Judge Ewing's analysis of Mil. R. Evid. 311(a)(3) and Mil. R. Evid. 311(c)(3) determining that the evidence is admissible; although I suspect that former will effectively swallow the later, at least for all cases arraigned after the effective date of Mil. R. Evid. 311(a)(3).

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[16] I note that service regulations currently state, "All personnel residing on an installation are required to register their firearms." *See* Army Reg. 190-11, Physical Security of Arms, Ammunition, and Explosives [hereinafter AR 190-11], para. 4-5c(2) (17 Jan. 2019). The term "installation" is broadly defined.

Similar language was included in the version of AR 190-11 applicable to this case. *See* AR 190-11, Physical Security of Arms, Ammunition, and Explosives, para. 4-5c(2) (5 Sep. 2013). However, this language was neither raised at trial nor briefed to this court, and it does not change my conclusion regarding appellant's convictions for violating MCOE 190-11.

That said, one possible reason that everyone thought MCOE 190-11 covered Porter Village was that, perhaps, it was *supposed* to cover Porter Village. *See* AR 190-11, para. 1-10 (5 Sep. 2013) (senior commanders shall establish punitive policies regarding firearm registration on Army installations).